UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                                          :
UNITED STATES OF AMERICA,                                 :
                                                          :                    22-CR-303 (JMF)
              -v-                                         :
                                                          :
GUSTAVO CHAVEZ,                                           :                    AMENDED
                                                          :              OPINION AND ORDER
                          Defendant.                      :
                                                          :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

    For years, the conditions in the federal jails that serve this District (and the Eastern

District of New York) have been a major, growing, and widely understood problem.  The

conditions at the Metropolitan Correction Center ("MCC") in Manhattan got so bad that, in

August 2021, after a single visit by the Deputy Attorney General, the Department of Justice

ordered the facility shuttered.[1]  Meanwhile, the only other federal detention center that serves

this District — the Metropolitan Detention Center ("MDC") in Brooklyn — has had its own

share of problems.  In the winter of 2019, a power outage left inmates without light or heat for a

full week while a polar vortex swept the East Coast.[2]  Since that time, the dockets of this Court

and the Eastern District have been filled with cases in which defendants complain about near-

perpetual lockdowns (no longer explained by COVID-19), dreadful conditions, and lengthy

---

[1]     *See* Benjamin Weiser, *Justice Dept. to Close Troubled Jail Where Jeffrey Epstein Died*,
N.Y. Times (Aug. 26, 2021), *available at* https://www.nytimes.com/2021/08/26/nyregion/MCC-
epstein-jail-closed.html.  Over two years later, the political branches have made little or no
progress to improve, let alone replace, the MCC.

[2]     *See* Steve Almasy et al., *Inmates Without Power at New York Federal Prison Shivering in
Their Cells for Days*, CNN (Feb. 3, 2019), *available at* https://www.cnn.com/2019/02/02/us/
new-york-federal-prison-no-heat/index.html.

delays in getting medical care.[3]  Contraband — from drugs to cell phones — is widespread.[4]  At

least four inmates have died by suicide in the past three years.[5]  It has gotten to the point that it is

routine for judges in both this District and the Eastern District to give reduced sentences to

---

[3]      There are far too many cases to cite.  For representative examples, however, see *United States v. Young*, No. 23-CR-475 (DLI), ECF Nos. 14-25; *United States v. Song*, No. 21-CR-89 (ARR), 2023 WL 6626151, at *1-2 (E.D.N.Y. Oct. 11, 2023); *United States v. Stewart*, No. 21-CR-42 (WFK), 2023 WL 2599668, at *7 (E.D.N.Y. Mar. 22, 2023); *United States v. Boyd*, No. 21-CR-486 (SHS), 2022 WL 790771, at *2 (S.D.N.Y. Feb. 3, 2022); and *Gautier v. United States*, No. 21-CV-7198 (CM), 2021 WL 5282209, at *4 (S.D.N.Y. Nov. 10, 2021).  *See also Scott v. Quay*, 338 F.R.D. 178 (E.D.N.Y. 2021); *Crespo v. Hurwitz*, No. 17-CV-6329 (RRM), 2020 WL 7021658 (E.D.N.Y. Nov. 30, 2020).

[4]      *See, e.g.*, *Santos v. Pullen*, No. 22-CV-704 (SVN), 2023 WL 5394617, at *1 (D. Conn. Aug. 22, 2023) ("During [an] investigation, Petitioner admitted to running a store [for drugs at the MDC]."); *United States v. Smith*, 660 F. Supp. 3d 210, 219 (S.D.N.Y. 2023) (noting the defendant's argument that "given the availability of contraband cellphones in MDC, he likely could have intimidated witnesses from there if he had wanted to" and finding that "he may have done just that"); Trial Tr. at 2139, *United States v. Blondet*, No. 16-CR-387 (JMF) (S.D.N.Y. Apr. 6, 2022), ECF No. 733 (defense counsel stating during summation that "every witness had an illegal cellphone" at the MDC, based on trial testimony); Sent'g Tr. at 15, *United States v. Morgan*, No. 19-CR-209 (RMB) (S.D.N.Y. May, 5, 2020), ECF No. 90 (Judge Berman stating about the MDC: "They are dirty.  They are infested with drugs.  You can get drugs and other contraband at the drop of a hat."); *see also* Noah Goldberg, *Feds Launched Emergency Search for Gun at Brooklyn Federal Jail*, N.Y. Daily News (Oct. 15, 2021) ("[A] firearm was discovered on the 6th floor of the [MDC] . . . . [and] numerous contraband cellphones were also recovered."), *available at* https://www.nydailynews.com/2021/10/15/feds-launched-emergency-search-for-gun-at-brooklyn-federal-jail.  Just last year, two correctional officers at the MDC were arrested for accepting bribes to smuggle contraband into the facility.  *See* Press Release, Dep't of Justice, Brooklyn Federal Correctional Officer Charged with Bribery (Apr. 18, 2023), *available at* https://www.justice.gov/usao-edny/pr/brooklyn-federal-correctional-officer-charged-bribery; Press Release, Dep't of Justice, Ex-Federal Correction Officer Pleads Guilty to Taking Bribes in Exchange for Smuggling Contraband into the Metropolitan Detention Center in Brooklyn (Mar. 20, 2023), *available at* https://www.justice.gov/usao-edny/pr/ex-federal-correction-officer-pleads-guilty-taking-bribes-exchange-smuggling.

[5]      *See* Fola Akinnibi & Marie-Rose Sheinerman, *Beleaguered Brooklyn Jail Blasted by Candidates in Crowded N.Y. Congressional Race*, Bloomberg (Aug. 16, 2022), *available at* https://www.bloomberg.com/news/articles/2022-08-16/ny-10-democratic-candidates-call-on-feds-to-fix-brooklyn-jail.

defendants based on the conditions of confinement in the MDC.[6]  Prosecutors no longer even put up a fight, let alone dispute that the state of affairs is unacceptable.

There are surely many reasons for these problems, but the one cited most often by the Government — publicly and privately, by both officials from the MDC and lawyers from the U.S. Attorney's Office — is a severe staffing shortage.  No doubt, there is considerable truth behind that explanation.  Data provided by the Government (at the Court's direction) confirms that there have been severe staffing shortages at the MDC for years.  *See* ECF No. 28, at 2.  As of November 2023, only 200 of 301 "authorized, non-supervisory correctional officer positions" at the MDC were filled and, of those 200 officers, thirty-four were either on extended leave or about to be transferred.  *See* ECF No. 28, at 1-2.  In other words, as of November 2023, *the MDC was operating at only about 55% of its full correctional officer staffing level*.  Nor is it a surprise that the MDC has had trouble recruiting and retaining employees.[7]  The starting salary for federal correctional officers in the New York area is barely above $45,000 — only about half of the Area Median Income for a single-person household in New York City.[8]  And it goes without

---

[6]     *See, e.g.*, Sent'g Tr. at 19-21, *United States v. Days*, No. 19-CR-619 (CM) (S.D.N.Y. Apr. 29, 2021), ECF No. 35 ("It is the finding of this Court that the conditions to which [the defendant] was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that. . . .  I think you've suffered triply as a result . . . .  I am convinced that no good would be served by keeping you incarcerated for one minute more than I am required to do by law."); Sent'g Tr. at 37, *United States v. Morgan*, No. 19-CR-209 (RMB) (S.D.N.Y. May, 5, 2020), ECF No. 90 (imposing a below-Guidelines sentences on account of "the conditions of the MDC," among other things).

[7]     The retention problem is not limited to the ranks of corrections officers.  Since June 2019, the MDC has had (no doubt in part because of the problems discussed above) a total of *eight* Wardens and Acting Wardens, with no one staying more than a few months at a stretch.

[8]     *See Correctional Officer Series 0007*, U.S. Office of Personnel Mgmt., *available at* https://www.opm.gov/policy-data-oversight/classification-qualifications/general-schedule-qualification-standards/0000/correctional-officer-series-0007 (explaining that annual salaries for federal correctional officers start at the GS-5 level, which is $46,494 at Step 1); *Area Median*

saying that the working conditions are challenging.[9]  Any first-year economics student would know that the primary way to improve this situation is to raise salaries and improve working conditions.  But there is no reason to believe that the political branches are likely to do either any time soon.

In the meantime, the only other way to mitigate the ongoing tragedy is to improve the ratio of correctional officers to prisoners by reducing — or at least not adding to — the prisoner population.  Enter this case.  Defendant Gustavo Chavez was arrested in April 2022 for distributing or possessing with the intent to distribute 400 grams or more of mixtures and substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A).  He was released on bail conditions and has been compliant with those conditions in every respect.  On November 27, 2023, Chavez pleaded guilty to the lesser-included offense of distributing and possessing with intent to distribute mixtures and substances containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 831(b)(1)(C).  In general, 18 U.S.C. § 3143(a)(2) mandates detention of any criminal defendant who, like Chavez, was convicted of such an offense — even where, as here, there is no suggestion of a risk of flight or danger to the community and no mandatory minimum term of imprisonment.[10]  Another

_____

*Income*, N.Y.C. Dep't of Housing Preservation and Dev., *available at* https://www.nyc.gov/site/hpd/services-and-information/area-median-income.page.

[9]      The union representing the MDC's correctional officers has long complained about unsafe working conditions at the facility.  In June 2023, for example, Rhonda Barnwell, the local's president, complained to the Regional Director of the Bureau of Prisons ("BOP") that the MDC's "staffing crisis" requires one correctional officer to "maintain 3 housing units in a single shift" with "little to no sleep."  *See United States v. Irizarry*, 23-CR-60 (JMF) (S.D.N.Y. Oct. 30, 2023), ECF No. 47-3, at 3.  "Would you want to work under these conditions? . . . What are you waiting for, another loss of inmate life?"  *Id.*

[10]      Some commentators have questioned the wisdom and justice of that mandate.  *See, e.g.*, Mark I. Cohen, *Congress Should Amend 18 U.S.C. § 3143*, 47 Hofstra L.R. 983 (2019).  The

statute, however, provides a safety valve of sorts: Under 18 U.S.C. § 3145(c), a district court has authority to order the release of someone otherwise subject to mandatory detention pursuant to Section 3143(a)(2) if, among other things, "it is clearly shown that there are exceptional reasons why such person's detention would not be appropriate." For the reasons that follow, the Court concludes that the conditions in the MDC qualify as "exceptional reasons" justifying Chavez's continuing release. Accordingly, the Court grants his motion to continue his conditions of release through the date of his sentencing.

## APPLICABLE LAW

The Court starts with a summary of the applicable law. The Bail Reform Act, as amended, governs whether a recently convicted defendant is eligible for release pending sentencing. *See* 18 U.S.C. §§ 3143(a)(2), 3145(c). For a defendant found guilty of certain offenses — including drug offenses carrying maximum sentences of ten or more years in prison (a category that includes almost all federal drug convictions, at least in this District) — Section 3143(a)(2) provides that the court "*shall* order" that the defendant "be detained unless":

> (A)(i) the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
>
> (ii) an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
>
> (B) the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

18 U.S.C. § 3143(a)(2) (emphasis added); *see also id.* § 3142(f)(1)(A)-(C) (defining the offenses to which Section 3143(a)(2) applies). These conditions are almost impossible to meet. It is the rare case indeed where the presiding judge finds that there "is a substantial likelihood that a

---

issues discussed here lend some weight to those arguments, but whether and how Section 3143 should be amended is ultimately a policy question for the political branches, not this Court.

motion for acquittal or new trial will be granted" — especially where the defendant was convicted following a guilty plea.  And the Court is not aware of a single case, at least in this District, where the Government has recommended — let alone at the time of conviction — that no sentence of imprisonment be imposed on a defendant subject to Section 3143(a)(2).

But there is a limited safety valve from this general rule of mandatory detention.  Under 18 U.S.C. § 3145(c), a defendant subject to detention pursuant to Section 3143(a)(2) "may be ordered released, under appropriate conditions," if two requirements are met.  *See also United States v. Lea*, 360 F.3d 401, 403 (2d Cir. 2004).[11]  First, the district court must find "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released" (whether subject to bail conditions or otherwise).  18 U.S.C. § 3143(a)(1); *see id.* § 3145(c).  Second, it must be "clearly shown that there are exceptional reasons why such person's detention would not be appropriate."  *Id.* § 3145(c).

The Supreme Court has never addressed the meaning of the "exceptional reasons" provision, and the Second Circuit has addressed it only sparingly.  The Court of Appeals first confronted the statute in *United States v. DiSomma*, 951 F.2d 494 (2d Cir. 1991).  The *DiSomma* Court began by observing that "[n]either the statute nor case law defines the circumstances which may qualify as exceptional reasons permitting release" and that "[t]he legislative history on the issue is sparse and uninformative."  *Id.* at 497.  "The only useful historical document," the Court continued, "is a letter from the Justice Department" to the Senator who sponsored the legislation "proposing the 'exceptional reasons' provision and suggesting two hypothetical

---

[11]   Section 3145(c) is titled "Review and appeal of a release or detention order" and, in at least some respects, "concerns actions taken by appellate courts."  *United States v. Garcia*, 340 F.3d 1013, 1014-15 n.1 (9th Cir. 2003).  Nevertheless, courts, including the Second Circuit, have held that the provision gives district courts authority to order a defendant otherwise subject to remand under Section 3143(a)(2) released pending sentencing.  *See id.*; *Lea*, 360 F.3d at 403.

6

situations where it might apply." *Id.* "The examples given" in the letter, the Court noted, "present a unique combination of circumstances giving rise to situations that are out of the ordinary." *Id.* Notably, however, the Court explicitly held that Justice Department's examples did not define the metes and bounds of what can qualify as "exceptional": "As in many things," the Court explained, "a case by case evaluation is essential, and it is not our intention to foreclose district judges from the full exercise of discretion in these matters. That discretion certainly is not limited by the examples contained in the Justice Department letter. It is constrained only by the language of the statute: 'exceptional reasons.'" *Id.*

The Circuit's only other published decision addressing the meaning of "exceptional reasons" in Section 3145(c) is *Lea*. There, the district court had found "'exceptional circumstances' warranting release" because the defendant was "a student enrolled in community college, . . . employed full time and [with] no prior convictions." 360 F.3d at 403. On appeal, the Court of Appeals held that this ruling was clearly erroneous:

> Exceptional circumstances exist where there is "a unique combination of circumstances giving rise to situations that are out of the ordinary." *DiSomma*, 951 F.2d at 497; *see also United States v. Lippold,* 175 F. Supp. 2d 537, 540 (S.D.N.Y. 2001) (collecting cases and noting that "circumstances that are 'purely personal' do not typically rise to the level of 'exceptional' warranting release"). The test under § 3145(c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as "exceptional." *DiSomma,* 951 F.2d at 497. But the circumstances in this case do not approach being "exceptional." There is nothing "exceptional" about going to school, being employed, or being a first-time offender, either separately or in combination.

*Id.* at 403-04;[12] *see also United States v. Colon*, 821 F. App'x 39, 42 (2d Cir. 2020) (summary order) (observing that the district court's "findings . . . — that [the defendant]

---

[12]     One could argue that the *Lea* Court misread *DiSomma* to require "a unique combination of circumstances giving rise to situations that are out of the ordinary." After all, the *DiSomma* Court used that language merely to describe the two examples given in the Justice Department's letter *and*, as noted, explicitly held that a district court's discretion is "certainly is not limited by"

supports his family, is employed, and was in compliance with his conditions of

supervision — were plainly not adequate" to support release under Section 3145(c)).

**DISCUSSION**

Several issues are not in dispute here.  First, it is undisputed that Chavez is subject to

Section 3143(a)(2), as he was convicted of a drug offense for which the maximum sentence is

twenty years' imprisonment.  *See* 21 U.S.C. § 841(b)(1)(C).  Second, it is undisputed that

Chavez fails to satisfy the nearly-impossible-to-satisfy conditions for release set forth in Section

3143(a)(2).  Given that he was convicted following a guilty plea, he wisely does not even attempt

to argue that it is likely a motion for acquittal or new trial would be granted.  *See* 18 U.S.C.

§ 3143(a)(2)(A)(i).  And, consistent with the norm, the Government has not recommended that

no sentence of imprisonment be imposed.  *See id.* § 3143(a)(2)(A)(ii).  Finally, it is undisputed

that Chavez "is not likely to flee or pose a danger to the safety or any other person or the

community" if he is left on bail subject to the release conditions to which he has been subject to

date.  *Id.* § 3143(a)(1).  That is for good reason.  Chavez is a seventy-year-old man, with no prior

criminal record and serious health problems, and he has complied in every respect with the

conditions of his release in this case to date.  *See* ECF No. 29 ("Plea Tr."), at 29-32, 35.

Thus, whether the Court has authority to leave Chavez out on bail turns on whether there

are "exceptional reasons why" his "detention would not be appropriate."  18 U.S.C. § 3145(c).

At his plea hearing, Chavez argued that his age and various medical conditions — including "a

neurocognitive disorder, an intellectual disability, and a panic disorder"; "a possible reemergence

---

the two examples.  *DiSomma,* 951 F.2d at 497.  (On top of that, it is questionable whether, by
today's standards, the Justice Department's letter is the kind of secondary source that a court
may even consult in construing the meaning of statutory language.)  Be that as it may, this Court
is obviously bound by the Second Circuit's decision in *Lea*.

of prostate cancer"; as well as hypertension, type 2 diabetes, and sciatica — rise to the level of "exceptional reasons."  Plea Tr. 31-32.  There is considerable force to that argument.  *See, e.g.*, *Garcia*, 340 F.3d at 1019-20 (observing that, in evaluating whether circumstances rise to the level of extraordinary reasons, a district court may "consider circumstances that would render the hardships of prison unusually harsh for a particular defendant.  Chief among such circumstances is a sufficiently serious illness or injury. . . .  District judges may consider such factors as the desirability of maintaining an uninterrupted course of treatment while a defendant remains in the care of a particular physician who is providing individual medical supervision to the patient.").  But the Court need not and does not decide whether that argument would suffice on its own because it concludes that the conditions at the MDC are themselves "exceptional reasons" why Chavez's detention pending sentencing "would not be appropriate."

The conditions at the MDC are dreadful in many respects, but three warrant particular emphasis.  First, inmates at the MDC spend an inordinate amount of time on "lockdown" — that is, locked in their cells, prohibited from leaving for visits, calls, showers, classes, or exercise.  (In Orwellian fashion, the Bureau of Prisons does not refer to these periods as "lockdowns"; instead, it refers to them as "modified operations."  *See* Bureau of Prisons, Annual PREA Report CY 2022 (2023), at 1-2.  But there is no mistaking what the practice entails.)  As of the date of this Opinion and Order, inmates at the MDC have reportedly been on lockdown for much or all of the last three weeks following an assault on staff, with a maximum of "two hours outside their cells each day" during a short reprieve.  Def.'s Letter 2, *United States v. Zeitlin*, No. 23-CR-419 (LAK) (S.D.N.Y. Jan. 2, 2024), ECF No. 58; *see also* Dec. 2023 Mem. for Inmate Population from Captain Rodriguez, *Zeitlin*, No. 23-CR-419 (LAK) (S.D.N.Y. Jan. 2, 2024), ECF No. 58-1. For far longer, lockdowns have been especially common on weekends and holidays.  *See* Plea Tr.

38-39 ("[P]eople who are detained at the MDC are not allowed out of their cells pretty much at a minimum three days of the week, Friday, Saturday, Sunday . . . ."). One defendant who kept a log of these lockdowns recently reported that he had been "locked down for 137 of [the] 245 days" he was detained at the MDC, or "more than 50% of his time at the facility." Sentencing Mem. at 7, *United States v. Jacobs*, 23-CR-413 (VB) (S.D.N.Y. Nov. 7, 2023), ECF No. 25. Confining inmates to their cells in this manner may have been justified during the height of the COVID-19 pandemic to prevent the spread of a deadly disease. *See, e.g.*, *Chunn v. Edge*, 465 F. Supp. 3d 168, 179-80, 183, 201 (E.D.N.Y. 2020) ("The MDC's response to COVID-19 has been aggressive and has included, among other steps, massively restricting movement within the facility, enhancing sanitation protocols, and creating quarantine and isolation units. And the data — though limited — suggests that these measures have been quite effective in containing COVID-19 . . . ."). But that is no longer the case — and the Government does not suggest otherwise. Regardless, confining inmates to their cells is, for at least some inmates, tantamount to solitary or near-solitary confinement, a practice that is increasingly viewed as inhumane. *See Johnson v. Prentice*, 144 S. Ct. 11, 12 (2023) (Jackson, J., dissenting from denial of certiorari) ("As Members of this Court have recognized, the practice of solitary confinement 'exact[s] a terrible price.'" (quoting *Davis v. Ayala*, 576 U.S. 257, 289 (2015) (Kennedy, J., concurring))); *Porter v. Pa. Dep't of Corr.*, 974 F.3d 431, 441-43 (3d Cir. 2020) (considering a "comprehensive meta-analysis of the existing literature on solitary confinement" that concluded that solitary confinement is "psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term . . . damage").

Second, the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates — especially where such care requires

10

the attention of outside providers.  *See, e.g.*, Women in Prison Comm., Nat'l Ass'n of Women

Judges, Second Visit to BOP's Metropolitan Detention Center (MDC), Brooklyn, New York 2

(2016) (finding that inmates at the MDC were denied essential gynecological care).[13]  It has

become common for defense counsel to require court intervention to ensure that inmates receive

basic care — and, even more shocking, not uncommon for court orders to go unheeded.  In one

recent case, for example, the MDC repeatedly defied court orders to transfer a defendant with a

MRSA infection to a medical facility; the defendant was instead "mistake[nly]" sent to the

segregated housing unit.  *See* Dec. 15, 2023 Hr'g Tr. at 3-5, 17, *United States v. Young*, No. 23-

CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023); Dec. 20, 2023 Hr'g Tr. at 5, 9, *Young*, No. 23-CR-475

(DLI) (E.D.N.Y. Dec. 20, 2023); *see also* John Annese, *Brooklyn Judge Calls Sunset Park*

*Federal Jail 'an Abomination' After Staff Ignore Order to Send Ailing Inmate to Medical*

*Facility*, N.Y. Daily News (Dec. 20, 2023), *available at* https://www.nydailynews.com/2023/12/

20/brooklyn-judge-calls-sunset-park-federal-jail-an-abomination-after-staff-ignore-order-to-

send-ailing-inmate-to-medical-facility.[14]  In another, the MDC defied an order to transport a

defendant for surgery to repair his cheek, which had been broken by another inmate at a previous

facility; the defendant was eventually informed that his cheek would have to be rebroken before

the surgery because it had healed improperly on its own.  *See* Initial Medical Evaluation Request,

---

[13]     Critical mental health treatment is similarly lacking.  In 2020, for example, Jamel Floyd, an inmate who was placed in solitary confinement despite his known "bipolar disorder and schizophrenia," died upon being pepper sprayed during a manic episode.  Office of the Inspector General, Dep't of Justice, Report of Investigation Regarding the Circumstances Surrounding the Death of Inmate Jamel Floyd at the Metropolitan Detention Center (MDC) Brooklyn 7 (2023).

[14]     Notably, when Judge Irizarry ordered, as a remedy for the MDC's "blatant disregard . . . of a very explicit order," that the defendant be transferred to a medical facility "forthwith, by no later than tomorrow," an MDC attorney responded that doing so would be an "impossibility" because "[o]ur staffing capabilities are currently — are extremely low."  Dec. 15, 2023 Hr'g Tr. at 3, 15, *Young*, No. 23-CR-475 (DLI) (E.D.N.Y. Dec. 15, 2023).

*United States v. Acosta*, No. 23-CR-376 (JLR), ECF No. 5 (Sealed) (S.D.N.Y. July 19, 2023);

*see also* Def.'s Bail Mem. 8, *United States v. Irizarry*, No. 23-CR-60 (JMF), ECF No. 47

(S.D.N.Y. Oct. 30, 2023).  And in yet another, it was the "position of MDC legal" to defy a court

order "to provide the defendant with a special diet . . . appropriate for . . . diabetes."  Conf. Tr. at

3, 9, *United States v. Palos-Garcia*, No. 21-CR-340 (JGK) (S.D.N.Y. Jan. 5, 2022), ECF No. 57.

Less extreme, but still problematic, denials or delays of needed care have reportedly become

commonplace.[15]

Finally, the MDC's physical conditions have long been problematic.  *See generally*

Order, *United States v. Espinal*, No. 11-CR-537 (JMA) (CLP) (E.D.N.Y. Oct. 17, 2016), ECF

No. 39 (collecting "letters relating to the conditions at the Metropolitan Detention Center,"

which reported visible mold on walls and ceilings, contaminated drinking water, vermin

infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers); *see*

*also* John Marzulli, *Judge Refuses to Send Women to Brooklyn Jail with "Third World"*

---

[15]    Once again, there are far too many cases to cite.  For representative examples, however,
see Def.'s Letter at 5-6, *United States v. Little*, No. 20-CR-57 (GBD) (S.D.N.Y. Jan. 6, 2022),
ECF No. 416 (reporting that the MDC had neglected to transport an inmate with a twisted bowel
to an emergency surgery for more than three months, even though she was vomiting daily and
unable to defecate for weeks at a time); Def.'s Letter at 1, *United States v. Martinez-Diaz*, No.
16-CR-387-10 (JMF) (S.D.N.Y. Nov. 8, 2021), ECF No. 564 (reporting that an inmate with
obstructive sleep apnea had not been able to use his CPAP machine for over eighty-five days
because the MDC had failed to provide him with an extension cord); Def.'s Sentencing Mem. at
12, *United States v. Velez*, No. 23-CR-325 (JMF) (S.D.N.Y. Nov. 22, 2023), ECF No. 31
("Because the MDC lacks sufficient staff to meet Mr. Velez's medical needs of 8 mg of
Suboxone 3 times a day, he receives only two-thirds of his required dose. . . .  Some days, Mr.
Velez does not even receive the prescribed dose."); Def.'s Sentencing Mem. at 7, *United States
v. Rivers*, No. 18-CR-192 (WFK) (E.D.N.Y. Feb. 23, 2022), ECF No. 155 (explaining that it took
two years for the MDC to provide the defendant with hearing aids despite multiple requests);
Def.'s Letter at 1-2, *United States v. Philips*, No. 20-CR-317 (BMC) (E.D.N.Y. Oct. 21, 2021),
ECF No. 18 (explaining that the MDC neglected to refill the defendant's asthma inhaler despite
multiple requests, and even after the defendant had "a coughing fit, gasping for air and
wheezing," leading his cellmate to "scream[] for help").

*Conditions*, N.Y. Daily News (Oct. 7, 2016), *available at* https://www.nydailynews.com/2016/
10/07/exclusive-judge-refuses-to-send-women-to-brooklyn-jail-with-third-world-conditions.
These problems came to the fore in the winter of 2019, when a power outage left inmates without
light and heat for a full week.  Following that well-publicized incident, Judge Torres held a
hearing at the MDC.  She witnessed "abundant water damage . . . like wet tissues hanging from a
ceiling" and "black blotchy mold" covering light fixtures.  Feb. 5, 2019 Hr'g Tr. at 167, 172,
*United States v. Segura-Genao*, 18-CR-219 (AT) (S.D.N.Y. Feb. 5, 2019), ECF No. 211.  One
inmate told her that he felt as though he was "sleeping under a waterfall."  *Id.* at 169.  (Judge
Torres also spoke with an inmate who said the dressing on a gunshot wound had not been
changed for so long that he was beginning to have "flashes in [his] eyes," and another who said
he was told by a corrections officer that a bleeding rash was "above [the officer's] pay grade."
*Id.* at 176, 180.)  Such problems have persisted.  In 2021, the MDC carried out "planned
maintenance" on the electrical system by enforcing a lockdown "over the course of four nights"
with no power and no water.  Conf. Tr. at 8-9, *Federal Defenders of NY, Inc. v. Federal Bureau
of Prisons*, No. 19-CV-660 (MKB) (E.D.N.Y. Oct. 15, 2021).  During this time, inmates' toilets
were reportedly "overflowing because . . . officers did not come by with buckets of water," and
inmates "were sitting with water on the cell of their floor in the dark with feces on it."  *Id.* at 10-
11; *see also* Conf. Tr. at 7, *United States v. Rivers*, No. 18-CR-192 (WFK) (E.D.N.Y. July 30,
2021), ECF No. 151 (reporting that an inmate had been left "without toilet facilities" because
"the officers had refused to either have his toilet repaired" or "allow him to use other toilet
facilities and to take him there when necessary").  More recently, the Court was advised that
many, if not most, of the emergency call buttons in the MDC's main building are not working —
even though those buttons are the only way (other than yelling and banging) to call an officer in

emergency situations during a lockdown.  *See* Letter from Loretta E. Lynch at 4, *Federal*

*Defenders of New York, Inc.*, No. 19-CV-660 (MKB) (E.D.N.Y. Nov. 30, 2023), ECF No. 403

(reporting that the buttons remained "broken" as of November 30, 2023).

      As noted, the reason most often given for many, if not all, of these problems is

understaffing.[16]  That may be so, but it is not an acceptable excuse.  Moreover, recent efforts to

address the staffing shortage aside, *see, e.g.*, Defs.' Letter at 2 n.3, *Federal Defenders of New*

*York, Inc. v. Federal Bureau of Prisons*, 19-CV-660 (MKB) (PK) (E.D.N.Y.), ECF No. 384

(noting that the BOP has offered higher-than-normal recruitment and retention incentives for

new correctional officers at the MDC); *see also* Advisory Grp. of DOJ Components, Report and

Recommendations Concerning Access to Counsel at the Federal Bureau of Prisons' Pretrial

Facilities (2023), *available at* https://www.justice.gov/d9/2023-07/2023.07.20_atj_bop_access_

to_counsel_report.pdf, the situation appears to be getting worse, not better.  As noted, the

MDC's current staffing levels — approximately 55% of full correctional officer staffing — are

the worst in at least three years.  *See* ECF No. 28, at 2.  Meanwhile, excluding the brief period

following closure of the MCC (when hundreds of new prisoners were transferred to the MDC),

the inmate population at the MDC, at 1,611, is the largest it has been in three years.  *Id.* at 1.  The

resulting ratio of prisoners to correctional officers — ten to one — is untenable, and there is no

---

[16]     A recent memo by Rhonda Barnwell, the president of the union local representing the MDC's correctional officers, helps explain why the MDC's staffing shortage translates directly into its inhumane conditions of confinement.  *See United States v. Irizarry*, 23-CR-60 (JMF), ECF No. 47-3 (S.D.N.Y. Oct. 30, 2023).  According to her memo, "[o]n a daily basis housing units . . . are left . . . unmanned by staff[] and locked down, with the expectation . . . that a single [] Officer is to make rounds, feed, and perform additional correctional duties" on three units during a single shift.  *Id.* at 1-2.  The frequency of lockdowns "angers the inmates and heightens the inherent danger for staff," but "[c]overage is so minimal that at times there are only 6 staff members available to respond to body alarms, staff assists, and[/]or inmate medical emergencies."  *Id.* at 2.

reason to believe that the staffing side of the equation will change any time soon.  It is for that reason that the only option is to reduce — or at least not add unnecessarily to — the prisoner population.

For these reasons, the Court holds that the conditions at the MDC constitute "exceptional reasons" why detention of most defendants who do not pose a risk of flight or danger to the community, including Chavez, "would not be appropriate."  18 U.S.C. § 3145(c).  Notably, that decision accords with the decisions of at least two other judges of this Court.  First, in *United States v. Boyd*, No. 21-CR-486 (SHS), 2022 WL 790771 (S.D.N.Y. Feb. 3, 2022, Judge Stein continued a similarly situated defendant's bail pursuant to § 3145(c), citing the MDC's "staffing issues, quarantines due to COVID-19, and lockdowns due to security issues" that "make it impossible for attorneys to visit their clients to prepare strategy . . . for sentencing."  *Id.* at *2. [17] Second, in May 2023, Judge Engelmayer continued a defendant's bail pursuant to § 3145(c) in light of the MDC's "unacceptable," "inhospitable, [and] terrible" conditions — despite the fact that "[t]he pandemic is now on the wane."  Plea Tr. at 33, *United States v. Arias*, No. 22-CR-495 (PAE), ECF No. 34 (S.D.N.Y. May 5, 2023).  Judge Engelmayer concluded, as the Court does here, that "until the . . . Bureau of Prisons really can get its act together . . . , where a defendant is not a risk of flight, is not a danger to the community, and there aren't special reasons for them to be remanded, avoiding putting a defendant in conditions like that qualifies as an exceptional reason under 3145(c)."  *Id.*[18]  More broadly, the Court's decision accords with decisions that

---

[17]     Granted, Judge Stein's reasoning relied in part on the circumstances presented by COVID-19 and those circumstances have improved.  In some ways, however, the conditions at the MDC are even worse now.  At the time of Judge Stein's decision in *Boyd*, the ratio of inmates to correctional officers was only eight to one; now, as noted, it is ten to one.

[18]     The Court surmises that many other judges in this District and the Eastern District of New York have relied on the conditions at the MDC in permitting defendants subject to remand

have held that a potential impact of a defendant's detention on third parties can justify continuing release pursuant Section 3145(c). *See, e.g.*, *United States v. Sabhnani*, 529 F. Supp. 2d 377, 383 (E.D.N.Y. 2007) (finding exceptional reasons existed for a defendant who was "solely responsible for operating his business and ha[d] various employees who [were] dependent upon [him for] their jobs, salaries and benefits"); *accord United States v. DiMattina*, 885 F. Supp. 2d 572, 589 (E.D.N.Y. 2012).

The Court's holding is also consistent with — or, at least, not inconsistent with — the Second Circuit's decisions in *DiSomma* and *Lea*.  As noted, the *Lea* Court stressed that "[t]he test under § 3145(c) is necessarily a flexible one, and district courts have wide latitude to determine whether a particular set of circumstances qualifies as 'exceptional.'"  360 F.3d at 403. In a similar vein, the *DiSomma* Court granted to district judges "the full exercise of discretion in these matters" and observed that such discretion "is constrained only by the language of the statute: 'exceptional reasons.'"  951 F.2d at 497.  To be sure, the Second Circuit has also held (perhaps erroneously, *see supra* note 12) that a district court must find "a unique combination of circumstances giving rise to situations that are out of the ordinary" to apply Section 3145(c). *Lea*, 360 F.3d at 403.  But the conditions at the MDC are certainly out of the ordinary and, taken together, constitute a unique combination of circumstances — even if they apply to more than one defendant.  *But see United States v. Mostrom*, 11 F.3d 93, 95 (8th Cir. 1993) (holding that "inadequacies in the general means of transportation of prisoners from places of holding court to

---

pursuant to Section 3143(a)(2) to remain on bail pending sentencing.  Judges rarely issue written opinions in this area.  Instead, most judges address the issue on the record after accepting a plea, as Judge Engelmayer did in *Arias* (and as he has done in many other similarly postured cases), reaching the same result).  Some judges, the Court suspects, do not address the issue explicitly at all and merely leave the defendant's bail conditions in effect without discussion.

places of detention" did not qualify as "extraordinary reasons" justifying release under Section 3145(c)).  In the height of the COVID-19 pandemic, it was commonplace for courts to find that the conditions of confinement at the MDC and MCC constituted "extraordinary reasons" justifying release.  It follows that the circumstances qualifying as exceptional under *DiSomma* and *Lea* need not be unique to a particular defendant.[19]

In any event, the conditions at the MDC combined with Chavez's unique circumstances plainly satisfy the Second Circuit's standard.  Indeed, many district courts "have found that conditions in prisons, in combination with the personal circumstances of individual defendants, can constitute exceptional circumstances."  *United States v. Campbell*, No. 20-CR-631 (AKH), 2022 WL 2209371, at *2 (S.D.N.Y. June 21, 2022) (citing cases); *see, e.g.*, *United States v. Reboux*, No. 5:06-CR-451 (FJS), 2007 WL 4409801, at *2 n.1 (N.D.N.Y. Dec. 14, 2007) ("The scant legislative history [of Section 3145(c)] indicates that . . . Congress intended that a defendant's personal circumstances *together with other unusual factual or legal issues* could constitute exceptional reasons for release" (emphasis added)).  That is the case here given, among other things, Chavez's age and serious medical conditions, which require care that the MDC may not be able to provide, not to mention the lack of any mandatory minimum term of imprisonment and Chavez's lack of any prior criminal history.  *See, e.g.*, *Reboux*, 2007 WL 4409801, at *2 (enumerating "personal circumstances" that "can be factors in the 'exceptional reasons' calculus," including "whether the defendant's criminal conduct was aberrational" and

---

[19]     Indeed, it would be absurd to accept that the conditions at the MDC during the height of the COVID-19 pandemic could qualify as "exceptional reasons" justifying release under Section 3145(c) and to conclude that the conditions there now could not.  The fact that the harsh conditions during COVID-19 have persisted and, in some ways, even worsened makes the present circumstances more "exceptional," not less.

"the length of the [anticipated] prison sentence" (citing *Garcia*, 340 F.3d at 1019-21)).  Given those individual circumstances, it would be cruel and unjust to detain Chavez in the MDC pending sentencing.  *See Campbell*, 2022 WL 2209371, at *2.  Accordingly, exercising its broad discretion in these matters, *see Lea*, 360 F.3d at 403; *DiSomma*, 951 F.2d at 497, the Court has authority to, and does, continue Chavez's bail through the date of his sentencing.

## CONCLUSION

This District and the Eastern District have, for years, made efforts — through orders in individual cases, through bodies like the Criminal Justice Advisory Board, and through more informal efforts — to improve conditions at the MDC, for individual inmates and more broadly. The undersigned will continue to participate in those efforts because it is imperative that those detained pursuant to the order of a court are treated humanely.  *Cf. Callins v. Collins*, 510 U.S. 1141, 1145 (1994) (Blackmun, J., dissenting) ("From this day forward, I no longer shall tinker with the machinery of death.").  But the time has come to recognize that, no matter how well intentioned officials at the MDC (and the United States Attorney's Office) may be, there is no way the grim conditions at the jail will materially improve until the grave staffing shortages are addressed.  And that is not going to happen unless the political branches commit considerably more resources to the matter, which seems unlikely to happen any time soon.[20]  Until that time

[20]     It is ironic, to say the least, that even as the Executive Branch fails to do what needs to be done to tend to its own house, it has — through the United States Attorney's Office — sought the appointment of an outside receiver to address "unsafe, dangerous, and chaotic" conditions in New York City's jail system.  *See* Letter from U.S. Attorney Damian Williams to the Honorable Laura Taylor Swain at 1, *Nunez v. City of New York*, No. 11-CV-5845 (LTS) (JCF), ECF No. 604 (S.D.N.Y. Nov. 17, 2023); *see id.* at 6 (arguing that the outside receiver should be given authority to, among other things, "more efficiently assign and deploy uniformed staff to maximize coverage in housing areas" and "hire and promote staff so that there are a sufficient number of qualified and experienced individuals to fill supervisory and other uniformed positions").

comes, the best the courts can do is not add unnecessarily to the inmate population and thereby avoid exacerbating the already frightening staff-to-inmate ratio.  That does not mean bailing every defendant charged with a crime in this District; due to risk of flight or danger to the community, some defendants are rightly detained even before they are sentenced.  *See* 18 U.S.C. § 3142.  But it does mean, Section 3143(a)(2) notwithstanding, continuing the bail of a defendant like Chavez, who has been 100% compliant with the terms of his release to date, does not pose a danger to anyone, and does not present a risk of flight.  Accordingly, and for the reasons discussed above, the Court finds that there are "exceptional reasons" justifying Chavez's continuing release pursuant to Section 3145(c) and thus grants his motion to continue his conditions of release through the date of his sentencing.

    SO ORDERED.

Dated: January 4, 2024
    New York, New York
                                                   _____
                                                   JESSE M. FURMAN
                                                   United States District Judge